**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| ROY RENFRO, et al., individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) **Case No. 06-2284 KHV** ) |
| SPARTAN COMPUTER SERVICES, INC., | ) ) |
| Defendant. | ) |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CONDITIONAL COLLECTIVE
ACTION CERTIFICATION PURSUANT TO 29 U.S.C. § 216(b)**

Plaintiffs' Motion for Conditional Collective Action Certification Pursuant to 29 U.S.C. §216(b) should be denied because they have not, and cannot, meet their burden of showing substantial allegations that they were together the victims of a decision, policy, or plan that violates the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §201 *et seq*. The Plaintiffs seek conditional certification of a disparate group of jobs, some of which SCS classified as exempt from federal overtime requirements, while others were considered non-exempt. SCS maintained separate procedures for exempt and non-exempt employees. SCS had a procedure for non-exempt employees to report overtime hours worked. Non-exempt employees who reported overtime were properly paid for overtime hours they worked. Simply put, the Plaintiffs and putative Plaintiffs are not tied together by any single decision, policy, or plan, much less a plan that violates the FLSA. Moreover, judicial economy cannot be achieved where the Court will revisit, in subsequent certification proceedings, issues that are currently ripe.

1

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

**I.      SCS Field Service Operations and Positions**

SCS installs and maintains computer-based point-of-sale ("POS") systems for national clients in the restaurant industry. Doc. 1 (Complaint ¶ 13). SCS's "Field Service Operation" is comprised of Field Technicians (a.k.a., Field Engineers), Senior Field Engineers/OTRs (a.k.a., Parts Supervisors), Senior Field Engineers, and Field Service Supervisors who run maintenance and repair service calls. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 15-19). Field Services Operations employees are located throughout the country and are responsible for servicing SCS clients in specified geographic areas ranging in size from (i) densely populated metropolitan areas to (ii) sparsely populated areas spanning 200 mile radii. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 18, 32-33); Exhibit B (Santiago Dep. pp. 8-9); Exhibit C (Renfro Dep. 14).

**II.     Field Technicians' Duties and Responsibilities**

A.      Field Services Operations' Work Assignments and Work Flow

Field Services Operations'[1] largely involves responding to repair calls from clients; this work cannot be scheduled in advance. Exhibit C (Renfro Dep. pp. 19-20). Repair work is assigned through central dispatch - i.e., client calls are routed to SCS's call center, a service ticket is opened, and the scheduled Field Technician responsible for the corresponding geographic area is paged. Exhibit A (Connorton/Rule 30(b)(6) Dep. p. 37-40); Exhibit C (Renfro Dep. pp. 11-16). After the appropriate Field Technician is paged:

---

[1] SCS maintains a separate Installation Operation. Exhibit A (Connorton/Rule 30(b)(6) Dep. p. 19).

- The Field Technician contacts the call center (preferably within 20 minutes) to determine the nature of the call and provide an estimated time of arrival at the client's site. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 38-39, 42); Exhibit B (Santiago Dep. p. 31); Exhibit C (Renfro Dep. pp. 14, 52). Field Technicians are not disciplined for failing to respond within any particular time period; rather, the call center simply pages the Field Technician again or the call is assigned to another Field Technician. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 38-39, 42, 61); Exhibit C (Renfro Dep. pp. 53).

- Field Technicians determine how to prioritize their work and provide estimated arrival times based on factors such as the contractual arrangement between SCS and its clients (i.e., Service Level Agreement – "SLAs"), the nature and urgency of the repair call, and other pending client repairs. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 43-46); Exhibit B (Santiago Dep. pp. 31); Exhibit C (Renfro Dep. pp. 14-15). If a Field Technician cannot reasonably handle a repair call, the service ticket may be assigned to another Field Technician in an adjacent geographic area. Exhibit A (Connorton/ Rule 30(b)(6) Dep. pp. 57-58); Exhibit C (Renfro Dep. pp. 27-30).

- SLAs include varying response times for repairs, which allows SCS to prioritize its repair calls. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 43-46). The quickest response time required under any SLA is 4 hours, *and a majority of the repair calls SCS receives require SCS to respond (i) within 12 hours, or (ii) by the next business day*. Exhibit A (Connorton/ Rule 30(b)(6) Dep. pp. 47-49); Exhibit B (Santiago Dep. 32); Exhibit C (Renfro Dep. pp. 73-75, 92). Time periods when client restaurants are closed, or when client restaurants do not want Field Technicians at their locations present (i.e., meal times or closing times), do not count against response times under SLAs. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 45-46, 121-122); Exhibit C (Renfro Dep. pp. 153-154). Field Technicians may, and are often required to, contact client restaurants directly to schedule convenient times for repair. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 44-45); Exhibit C (Renfro Dep. p. 37).

- Field Technicians travel to client restaurants and repair POS problems as scheduled. Exhibit B (Santiago Dep. pp. 31-32). Depending on the location of the client restaurant, and the Field Technician's location at the time he receives the service call, travel time varies from a matter of minutes to several hours. Exhibit B (Santiago Dep. 34-35); Exhibit G (Santiago Dep. Exhibit 1 – Mileage Report).

- Actual work time to complete POS repairs (i.e., excluding travel time) typically ranges from 15 minutes to an hour. Exhibit C (Renfro Dep. pp. 83-84); Exhibit G (Santiago Dep. Exhibit 1 – Mileage Report).

- After completing repair calls, Field Technicians contact the call center (either by phone, or more recently by personal digital assistant (PDA)) to "close" service tickets and provide information about travel, and onsite, work time required for the calls. Exhibit C (Renfro Dep. pp.21-22).

B.      Typical Call Frequency and Weekly Travel and Onsite Work Time

During a typical work week, Field Technicians handle 10-15 calls, and record 20 to 30 total hours of travel and on-site work time. Exhibit B (Santiago Dep. pp. 48-53); Exhibit C (Renfro Dep. pp. 20, 156-157); Exhibit G (Santiago Dep. Exhibit 1 – Mileage Report). Plaintiffs in this case testified as follows

- Plaintiff Renfro averaged 14 calls per work week, with a low of four, and a high of 30, calls in a work week. Exhibit C (Renfro Dep. p. 20). He averaged a total of 20 to 25 hours of travel and on-site work time each work week, plus some additional remote phone support typically lasting about 15 minutes. Exhibit C (Renfro Dep. pp. 156-157, 159-160).[2]

- Plaintiff Santiago ordinarily handled 12 or 13 calls per work week. Exhibit B (Santiago Dep. p. 50); Exhibit G (Santiago Dep. Exhibit 1 – Mileage Report). Records show that Plaintiff Santiago's travel and on-site work time spanned 5 to 45 hours in a work week, with his typical work week averaging being between 25 and 30 hours. Exhibit B (Santiago Dep. pp. 48-52); Exhibit G (Santiago Dep. Exhibit 1 – Mileage Report). He also provided remote phone support about once a day, with typical calls lasting about 20 minutes. Exhibit B (Santiago Dep. pp. 20-21).

C.      Responding to Repair Calls

Excepting scheduled days off and sick days, Field Technicians are expected to accept pages from SCS's call center between 6:00 a.m. and 10:00 p.m. Exhibit C (Renfro Dep. pp. 99-100, 152). Field Technicians are very rarely paged after 9:00 or 10:00 p.m., and repair work associated with these late calls is almost uniformly scheduled for the next day. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 115, 121); Exhibit B (Santiago Dep. pp. 37-39); Exhibit C

---

[2]   After his duties changed and he became a Parts Supervisor, he spent additional time handling parts management and providing technical support to Field Technicians by phone. Exhibit C (Renfro Dep. p. 157).

(Renfro Dep. pp. 99-105, 153-156). Late night repair calls are held by the SCS call center and released at 6:00 a.m. so Field Technicians can plan their service calls for the day. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 115, 121); Exhibit B (Santiago Dep. pp. 36-37).

Field Technicians typically schedule 4 to 5 days off per month, and they may trade scheduled work days with other Field Technicians; Field Technicians have additional vacation allowances  Exhibit B (Santiago Dep. pp. 10-11, 41-42, 44); Exhibit C (Renfro Dep. pp. 130-132).[3]  Although SCS offered days off and did not page Field Technicians when they were not scheduled to work, some Field Technicians chose to respond to repair calls when they were not scheduled to work. Exhibit B (Santiago Dep. pp. 41-42).

In the form declarations signed by each of the Plaintiffs, they make vague and conclusory assertions that that they were "required ... to be available to respond to urgent customer calls within a short period of time" and that their on-call status "result[ed] in significant restrictions on [their] personal activities."  Doc. 53-10 (form declarations of Plaintiffs). The Plaintiffs testified otherwise, acknowledging they could engage in activities such as:

- Traveling within their geographic territories. Exhibit B (Santiago Dep. 84-85); Exhibit C (Renfro Dep. pp. 33-34).

- Shopping. Exhibit B (Santiago Dep. pp. 77-78); Exhibit C (Renfro Dep. pp. 34).

- Eating at restaurants. Exhibit B (Santiago Dep. pp. 82-83); Exhibit C (Renfro Dep. pp. 35-36).

- Going to movies. Exhibit B (Santiago Dep. pp. 83-84).

- Visiting friends and relatives. Exhibit C (Renfro Dep. pp. 90-91).

---

[3]  Renfro complains that he seldom had days off, but admits he often chose to "sell"  his vacation time back to SCS rather than take his vacation time as days off. Exhibit C. (Renfro Dep. pp. 42-43).

- Engaging in hobbies such as flying model airplanes, reading, watching television, woodworking and raising hybrid bobcats. Exhibit B (Santiago Dep. pp. 74-78, 87-88; Exhibit C (Renfro Dep. pp. 40-41, 76-79).

- Starting and operating side businesses. Exhibit B (Santiago Dep. pp. 53-57).

Nothing prevented Field Technicians from engaging in a wide range of personal activities. Indeed, the representative Plaintiffs testified that their personal activities were seldom interrupted:

- Plaintiff Renfro estimated he had been interrupted during his semi-weekly trips to Wal-Mart a few times -- perhaps six -- over three and a half years. Exhibit C (Renfro Dep. pp. 34-35). Approximately 1 to 2% of his 360 visits during that time were interrupted by repair calls. Exhibit C (Renfro Dep. pp. 34-35, 90).

- Although Plaintiff Renfro dines at restaurants daily (i.e., well over 1,000 times in more than three years), he estimated left restaurants before finishing meals due to repair calls on approximately six occasions – less than 1% of the time. Exhibit C (Renfro Dep. pp. 35-36, 90). He acknowledges he did not have to leave before finishing his meals to meet response time requirements, but he chose to do so anyway. Exhibit C (Renfro Dep. pp. 90).

- Plaintiff Santiago said that, over the two years and four months he worked for SCS, he had to leave while shopping twice due to "emergency" repair calls. Exhibit B (Santiago Dep. pp. 81-82). These interruptions amounted to 1% of his shopping trips during that time. Exhibit B (Santiago Dep. p. 82).

- Plaintiff Santiago testified that he frequently eats at restaurants and goes to movie theatres with his wife, but he never had to interrupt a meal or movie due to a service call; rather, he had flexibility to finish his personal business, then handle the repair calls (including urgent repair calls) under SLAs. Exhibit B (Santiago Dep. pp. 82-84).

III.    **Supervisory and Administrative Responsibilities of the Field Service Supervisors, Senior Field Engineers, and Parts Supervisors (a.k.a. Senior Field Engineer/OTR)**

A.    Field Service Supervisors and Senior Field Engineers

Plaintiff Tom Read was employed by SCS from November 2001 until his resignation in May 2004; he was a Senior Field Engineer from early 2002 until the end of his employment. Exhibit D (Read Dep. pp. 9-12). Plaintiff Read acknowledges that, as a Senior Field Engineer, he was responsible for interviewing, hiring, disciplining, and training Field Technicians, and he coordinated Field Technicians' work flow and reassigned repair calls. Exhibit D (Read Dep. pp. 14-17, 20, 22-24, 36-39). Likewise, individuals who were Field Service Supervisors have overall accountability for Field Technicians in their geographic areas, including interviewing, hiring, performance reviews, discipline, work flow and rebalancing. Exhibit A (Connorton/Rule 30(b)(6) Dep. p. 56); Exhibit D (Read Dep. pp. 22-24, 38-39).

B.    Parts Supervisors

Plaintiff Renfro was a Senior Field Engineer/OTR (a.k.a., Parts Supervisor) from March 2004 until the end of his employment in October 2006. Exhibit C (Renfro Dep. p. 8). In that capacity, his role was to manage the parts inventory for four to five Field Technicians in adjacent geographic areas. Exhibit C (Renfro Dep. p. 25). He ordered parts, made sure inventory on hand was sufficient to meet expected needs, redistributed parts among Field Technicians, and returned bad parts. Exhibit C (Renfro Dep. pp. 92-95). Although SCS provided inventory guidelines, Plaintiff Renfro acknowledges he was expected to use his judgment in (i) ordering and distributing parts, and (ii) assessing inventory needs, based on actual usage and trends. Exhibit C (Renfro Dep. pp. 163-165). As Parts Supervisor, Plaintiff Renfro also provided technical assistance to Field Technicians. Exhibit C (Renfro Dep. pp. 26-27).

7

IV.     **Various Pay Policies**

A.      <u>Field Technicians</u>

Field Technicians were paid a salary for any work time up to 40 hours per work week, *but they were treated as non-exempt under the FLSA* (i.e., they were paid overtime). Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 68-69); Exhibit B (Santiago Dep. pp. 21, 67-68); Exhibit C (Renfro Dep. pp. 60-61, 161-162); Exhibits E & F (Renfro Dep. Exs. 1 and 2 (Renfro Offer Letter and Job Description)). The Plaintiffs admit they understood SCS's pay policy was that Field Technicians were eligible for overtime if they worked more than 40 hours in a work week. Exhibit B (Santiago Dep. pp. 21, 67-68); Exhibit C (Renfro Dep. pp. 60-61).

SCS had a procedure for Field Technicians to submit overtime hours for payment.  Doc. 53, p. 5). The procedure involved three steps: (i) Field Technicians filled out timesheets indicating work time for the week, (ii) Field Technicians submitted the timesheets to their supervisors for approval, and (iii) supervisors then submitted timesheet to SCS's corporate office for payment. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 68-69, 99-104); Exhibit B (Santiago Dep. pp. 21-23, 67-68);   Exhibit H (Connorton/ Rule 30(b)(6) Dep. Exhibit 8 (Pay Policy); Exhibit I (Connorton/Rule 30(b)(6) Dep. Exhibit 10 (Sample Time Sheets). When overtime was submitted, it was  approved and paid. Exhibit B (Santiago Dep. pp. 21, 28, 68). [4]

In support of their proposition that Field Technicians were deemed exempt from overtime under the FLSA (which is clearly contrary to the Plaintiffs' testimony noted above), the Plaintiffs rely on (i) job descriptions dating to 2002, and (ii) the declaration of a former, disgruntled

---

[4]   Like any other business, SCS wanted to monitor and control the amount of overtime hours worked and required overtime to be approved. Exhibit B (Santiago Dep. pp. 24-25, 28). Despite being told not to work overtime without approval, and knowing SCS's policy prohibiting unauthorized overtime, one of the representative Plaintiffs claims he worked overtime anyway. Exhibit B (Santiago Dep. pp. 25-29). Of course, this anomaly does not suggest a single decision, policy, or plan that ties the Plaintiffs together.

Director of Human Resources who speaks to SCS's classification of employees "when [she] arrived at SCS" in February 2002 – all notably, outside the longest applicable statute of limitations.[5]   Doc. 53. p. 5, referencing Doc.53-2 (Dec. of C. Cooper ¶ 5) and Doc. 53-5 (job description from 2002).[6]

Plaintiffs also selectively quote from an SCS document indicating the company "does not pay overtime benefits" and they ignore the surrounding language, which clearly indicates that *non-exempt employees are eligible for overtime benefits*. Doc. 53, p. 5, referencing Doc. 53-4.[7] The Plaintiffs also fail to establish that this document represents an actual policy implemented by SCS – a significant evidentiary issue considering the only witness to testify about it believes it was a draft policy and, regardless, the draft has been revised since it was apparently drafted in 2003. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 196-203).[8]

B.   Field Service Supervisors, Senior Field Engineers, and Parts Supervisors

---

[5] This suit was initiated on July 11, 2006. FLSA claims must be commenced within two years of accrual (i..e, after July 11, 2004); claims arising from "willful" violations must be commenced within three years (i.e., July 11, 2003). 29 U.S.C. §255(a).

[6]  Plaintiffs also rely on an e-mail sent from one of SCS's regional managers to a new employee in 2004. Doc. 53, p. 6, referencing Doc.53-9 (Phillips E-mail). On its face, it is unclear for what position the new employee was being hired. More importantly, this document fails to evidence a single company-wide decision, policy, or plan that applied to all the existing or putative Plaintiffs. *See* Exhibit A (Connorton/Rule 30(b)(6) Dep. pp. 90) (Phillips is unique in sending out welcome e-mails to new employees reporting to him).

[7]  The full text of the language states:

Each employee is designated as either non-exempt or exempt from federal and state wage and hour laws.

- Non-exempt employees are entitled to overtime pay under the specific provisions of federal and state laws.
- Exempt employees are excluded from specific provisions of federal and state wage and hour laws.

SCS does not pay Over Time benefits; it is the responsibility of the employee and the area Supervisor to manage the employee's hours.

[8]  The draft should also be considered in context of the undisputed testimony that Field Technicians were in fact treated as non-exempt and paid overtime when they worked more than 40 hours per work week.

It is undisputed that SCS considers Field Service Supervisors, Senior Field Engineers, and Parts Supervisors to be ineligible for overtime (i.e., they are exempt from overtime under the FLSA) because of their management and/or administrative duties. Exhibit A (Connorton/Rule 30(b)(6) Dep. pp.71-72); Exhibit C (Renfro Dep. pp. 64, 162-163).

## V.   **Procedural History**

This case was filed on July 11, 2006. Doc.1, ¶ 1. The Plaintiffs assert claims for alleged unpaid overtime compensation under the FLSA. *Id.* Under the guise of 29 U.S.C. § 216(b), Plaintiffs assert their claims individually and on behalf of past and present employees of SCS who are allegedly "similarly situated." *Id.* at ¶28.

Initially, four current or former SCS employees filed consents to join this case; all four were named in the Complaint. *Id.* at ¶¶ 7, 10 and Attachments. At this point, 20 individuals have filed consents to join this putative collective action. *Id.*, Attachments; *see also* Docs. 2, 4, 10, 15, 16, 18, 19, 21, 22, 24, 25, 28, 31, 32, 34, 43, and 48. The Complaint asserts claims by, and on behalf of, Field Technicians,  Field Engineers, Parts Supervisors, and Field Service Supervisors.[9] *Id.* at ¶ 11.

On February 16, 2007, at the same time they filed their Motion for Conditional Certification, Plaintiffs also moved to amend their Complaint. Doc. 51. In the Proposed Amended Complaint, the Plaintiffs are described as:

> [C]urrent or former field technicians, field engineers, **senior field engineers**, parts supervisors, field supervisors, **installers, senior installers, lead installers**, or similar workers who have been victimized by SCS's unlawful compensation practices.

---

[9] Only one individual previously employed as an installer (i.e., Michael Jarvis) has filed a consent to join this action; his consent was filed on January 10, 2007. Doc. 43 (Jarvis Consent). SCS takes exception to the untimeliness of this consent. *See* SCS's Memorandum in Opposition to Plaintiffs' Motion for Leave to File First Amended Complaint, Doc. 58, which is incorporated herein by reference.

Doc. 51, Exhibit A (Proposed Amended Complaint, ¶ 27)(emphasis added to highlight additional scope of positions sought).

Plaintiffs have now moved for conditional collective action certification. Docs. 52, 53. In making their motion, the Plaintiffs apparently limit the scope of this putative collective action to "all current and former employees of Spartan Computer Services, Inc. (SCS) who worked as *field technicians or installers* from July 11, 2003 to the present." Doc. 52, p. 1 (emphasis added). Consistently, the Plaintiffs' memorandum in support references only "*field technicians and installers.*" Doc. 53. The Plaintiffs do not mention Parts Supervisors (even though the lead Plaintiff, Roy Renfro, served in that role for most of his tenure with SCS) and they apparently want to shoehorn Senior Field Engineers, Field Service Supervisors, Senior Installers, and Lead Installers into this case by way of conclusory allegations that their "primary duties" were the same as subordinate Field Technicians and Installers.  Doc. 53, pp. 3, 4.

## ARGUMENTS

The Court should not provisionally certify this case as a collective action because the Plaintiffs and putative Plaintiffs cannot meet their burden of demonstrating they are similarly situated under 29 U.S.C. §216(b). Rather than identify a single decision, policy, or plan that violates the FLSA, the Plaintiffs merely claim, without factual support,[10] that the scope of their

---

[10] The apparent cornerstone of the Plaintiffs' case is a fatally flawed declaration from Christina Cooper, SCS's former Human Resources Director. The Court ordinarily disregards sworn testimony, whether by affidavit or declaration, that (i) is not based on personal knowledge, (ii) does not include facts that would be admissible in evidence, and (iii) does not show affirmatively that the affiant is competent to testify to the matters stated therein. *International Tobacco Partners, Ltd. V. Kline*, 2007 WL 431013 (D.Kan. Feb. 8, 2007), *citing Maverick Paper Co. v. Omaha Paper Co.,* 18 F.Supp.2d 1232, 1234-35 (D.Kan.1998).

Ms. Cooper testifies she was employed by SCS from February 2002 through February 2004. Importantly, Ms. Cooper does not provide any testimony about the specific dates of the alleged acts or omissions referenced in her declaration. This suit was initiated on July 11, 2006. FLSA claims must be commenced within two years of accrual; claims arising from "willful" violations must be commenced within three years. 29 U.S.C. §255(a). Accordingly, it

purported collective action should encompass five separate jobs, including Field Technicians, Senior Field Engineers, Parts Supervisors, Field Service Supervisors, and Installers.[11] These varying jobs should not be lumped together in this case because various jobs are subject to different pay procedures – not a common decision, policy or plan as required. Moreover, Plaintiffs fail to make any argument as to how any of SCS's pay practices fail to comply with the FLSA. Finally, there is no judicial economy associated with provisionally certifying this case because the Court will be required to revisit the same issues in subsequent proceedings.

I.   **Plaintiffs Fail to Present "Substantial Allegations" That They, and Other Potential Plaintiffs, Were Subjected To a Common Policy or Plan that Violated the Law.**

   (A)   **The *Thiessen* Standard for Conditional Certification.**

The Tenth Circuit has identified three approaches to determining if actions should proceed collectively under the FLSA. *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001). One of those approaches, which the Court adopted in this case, is a bifurcated *ad hoc* approach. *See* Doc. 26, ¶¶ 2 and 3 (setting discovery deadlines for issues

---

is entirely possible, if not probable, that the alleged acts or omissions predate the applicable statute of limitations (i.e., for the original Plaintiffs, July 11, 2004 if the two year statute of limitations applies, or July 11, 2003 if the three year statute of limitations applies), thereby making her testimony irrelevant and inadmissible. Of course, there is no way for the Court to discern when the acts or omissions alleged by Ms. Cooper occurred – nor is it obliged to. Ms. Cooper also attempts to bootstrap inadmissible hearsay testimony into her defective declaration. (*See* Doc. 53, Exhibit 1, ¶10, "I was told that the company's upper management would rather pay the fine than be compliant, because it was cheaper.")

Ms. Cooper also testifies to numerous legal conclusions she is not competent to make. For example, she repeatedly testifies about other employees' purported "primary duties" (*see* Doc. 53, Exhibit 1, ¶¶ 2 and 3), which is a defined term under the FLSA's implementing regulations. *See* 29 C.F.R. §541.700. Likewise, she makes legal conclusions about employees being "on call," (*see* Doc. 53, Exhibit 1, ¶ 4), which is not only a central legal theory in this case (*see* Doc. 1, ¶¶ 16 – 21), but is also defined by the FLSA's regulations. *See* 29 C.F.R. 785.17. Moreover, Ms. Cooper summarily concludes that SCS did not comply with its legal requirements to maintain records of hours worked, presumably under 29 C.F.R. §516.2(a)(7). Ms. Cooper was Human Resources Director, (*see* Doc. 53, Exhibit 1, ¶ 1) not a lawyer or judge. She is not competent to make legal conclusions and provide legal opinions.

[11] For the reasons set forth in SCS's Memorandum in Opposition to Plaintiffs' Motion for Leave to File First Amended Complaint, *see* Doc. 58, which is incorporated herein by reference, Installers should be excluded from this purported collective action.

"relating to whether the matter should proceed as a collective action," setting a briefing schedule for provisional certification, and setting other deadlines "following the determination of whether the matter will proceed as a collective action").  As the Tenth Circuit has explained:

> Under [this] approach, a court determines, on an ad hoc case-by-case basis, whether plaintiffs are similarly situated. In utilizing this approach, a court typically makes an initial "notice stage" determination of whether plaintiffs are "similarly situated." In doing so, a court requires nothing more than **_substantial allegations that the putative class members were together the victims of a single decision, policy, or plan_**. At the conclusion of discovery (often prompted by a motion to decertify), the court then makes a second determination, utilizing a stricter standard of "similarly situated."

*Thiessen*, 267 F.3d at 1102 (emphasis added, internal citations and quotations omitted). This standard does not render conditional certification inevitable simply because the Plaintiffs' Complaint contains the "magic words" that employees are "similarly situated."

Consistent with the Tenth Circuit standard, courts require plaintiffs to "make a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of *a common policy or plan that violated the law*." *Roebuck v. Hudson Valley Farms, Inc.*, 239 F.Supp. 2d 234, 238 (N.D.N.Y 2002) (emphasis added), *citing and quoting Realite Ark Restaurants Corp.*, 7 F.Supp.2d 303, 306 (S.D.N.Y. 1998); *Briggs v. U.S.*, 54 Fed.Cl. 205, 207 (Fed.Cl. 2002). Although the burden to establish that putative plaintiffs are similarly situated is relatively minimal, *it is a burden nonetheless,* and Courts still require an initial showing. *Severtson v. Phillips*, 137 F.R.D. 264, 266 (D. Minn. 1991); *see also White v. Osmose, Inc.*, 204 F.Supp. 2d 1309 (M.D. Ala. 2002) (declining to certify a nationwide class of current and former employees who were allegedly "similarly situated" with respect to their job duties and pay because there was no evidence the employer's policies necessarily led to nationwide FLSA violations). It is the *Plaintiffs' burden* to make this showing. *See, e.g., Hipp v. Liberty National*

*Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001); *Grayson v. Kmart,* 79 F.3d 1086, 1098 (11th Cir. 1996) (citations omitted).  Notably, the Tenth Circuit has specifically advised that, "[a] District Court considering a motion to certify or decertify is entitled to look past the pleadings and examine the evidence produced during discovery …. *Thiessen*, 267 F.3d at 1108.[12]

**(B)    The Plaintiffs Were Not Treated Under A Single Decision, Policy, or Plan, and Therefore Should Not Be Lumped Together.[13]**

The evidence developed through "notice stage" discovery makes clear that there was no single decision, policy, or plan under which Plaintiffs can claim that all the members of their putative class is "similarly situated."  Specifically, SCS uncontrovertibly treats Field Technicians as non-exempt and pays them overtime compensation for hours worked in excess of 40 hours in a workweek. On the other hand, SCS classifies and treats Senior Field Engineers, Parts Supervisors, and Field Service Supervisors as exempt from the FLSA's overtime requirements. Because these positions are considered exempt, these employees do not report overtime hours worked and SCS does not pay overtime premiums when they work more than 40 hours in a workweek.  Further, beyond the clear differences in overtime treatment of these groups of employees, they also have significantly different duties, responsibilities, and job requirements.

The Plaintiffs are not similarly situated.  Indeed, the mere fact that some are treated as exempt and others non-exempt make this case inappropriate for conditional certification.  In *Diaz v. Electronics Boutique of America, Inc*., the district court declined to conditionally certify a

---

[12] This conclusion is wholly logical.  Bare allegations cannot be permitted to withstand uncontroverted evidence once the parties have had an opportunity to conduct discovery.  Similarly, failing to review the evidence would render first phase discovery pointless.

[13] The Plaintiffs put the cart before the horse. They erroneously rely on the assumption they are similarly situated because they work "under similar conditions."[13] This type of detailed analysis about their job conditions is premature and is better suited under the second phase of the *ad hoc* analysis. *Pivonka v. Board of County Com'rs of Johnson County, Kansas,*  2005 WL 1799208 (D.Kan., July 27, 2005), *citing Thiessen,* 267 F.3d at 1103 ("The Tenth Circuit specifically stated that the court reviews the … employment settings of the individual plaintiffs … in the court's second-stage analysis on a motion to decertify at the conclusion of discovery.")

collective action in similar circumstances.  2005 WL 2654270 (W.D.N.Y 2005).  In *Diaz,* the plaintiffs sought to certify a group of loan officers who were allegedly misclassified as exempt, with loan officers who were classified as non-exempt but were allegedly required to work "off-the-clock."  In rejecting plaintiffs' motion to certify, the court held there was no "factual nexus" between the employees who claimed they were misclassified and those who claimed they were forced to work off-the-clock.  *Id.* at * 4.  The Court explained the claims of employees who allegedly had been misclassified would "involve an analysis of daily duties and responsibilities and the amount of time spent on each one, whereas the claims [of the employees who alleged they had been forced to work off the clock] would involve an examination of hours worked, payroll records, and [the Company's] knowledge and/or permission of the alleged overtime hours worked." *Id.*

Similar to *Diaz,* because SCS had different policies in place for exempt versus non-exempt employees, it is impossible to find that all Plaintiffs were victims of the same policy or plan.  More specifically, the separate job categories at issue in the Plaintiffs' Complaint are not treated the same for purposes of recording and receiving overtime. While Field Technicians are required to work overtime and are paid for overtime hours they work, Senior Field Engineers, Parts Supervisors, and Field Service Supervisors are not paid for overtime hours worked and are not required to report their time. The varying classifications (i.e., exempt and non-exempt) under the FLSA, and the respective procedures applicable to each classification, militate against conditional certification of this case as a collective action.

    **(C)**    **Moreover, Plaintiffs Fail to Identify Any Policy or Plan That Arguably Violates the Law.**

Further, under the *Thiessen* standard, there must be "substantial allegations" that the plaintiffs were "***the victims*** of a common decision, policy of plan" – at least implicitly requiring that there must be some showing that the such a policy or plan is at least arguably illegal. *Thiessen*, 267 F.3d at 1102 (emphasis added); *see also Roebuck v. Hudson Valley Farms, Inc.*, 239 F.Supp. 2d 234, 238 (N.D.N.Y 2002) (plaintiffs must "make a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of *a common policy or plan that violated the law*").

Here, Plaintiffs make <u>no</u> argument – much less "substantial allegations" or a "modest factual showing" – as to what SCS policy even arguably violated the law.  Indeed, Plaintiffs spend the entirety of their fact statement stating that the Field Technicians are treated as "exempt."  First, obviously, these allegations are contrary to the undisputed testimony of even their own witnesses, and cannot reasonably be considered "substantial allegations" in the face of the uncontroverted evidence.  Second, standing alone, even a finding that SCS treated individuals as exempt does not constitute an allegation that SCS violated the FLSA.

Specifically, under the FLSA, as a general proposition, employees must be paid overtime for hours worked in excess of 40 hours in each work week -- unless the employees are exempt from the FLSA's overtime requirements. 29 U.S.C. §207 (general maximum hours and overtime law); 29 U.S.C. §213 (exemptions). Conspicuous by its absence from the Plaintiffs' motion seeking provisional certification is any reference to a policy or plan that violates 29 U.S.C. §§ 207 and 213. Instead, the Plaintiffs' argument boils down to unsubstantiated, conclusory allegations that the pool of putative Plaintiffs were treated as "exempt" and "similarly situated." That does constitute a "substantial allegation" of a violation of the FLSA.

Indeed, Plaintiffs acknowledge that SCS has a process (i.e., it has a policy or a plan) for non-exempt Field Technicians to receive overtime pay. Doc. 53, pp. 5 and 6. SCS pays Field Technicians a salary (regardless of the number of hours they work each week), and classifies them *non-exempt (i.e., overtime eligible)*.[14] SCS's procedure for Field Technicians to report hours worked in excess of 40 hours each work week amounts to nothing more than submitting a timesheet for approval. While Plaintiffs complain that the submission of a weekly timesheet is a "painful experience," it is inexplicable how submitting a timesheet only in those weeks in which an employee works overtime is more onerous than submitting a timesheet each and every week – the very thing which Plaintiffs appear to claim SCS should have done. Doc 53, p. 12. There is no showing by Plaintiffs that SCS's overtime procedure violates the FLSA.

Further, Plaintiffs admit that SCS pays Field Technicians for overtime hours they report. Presumably, because the Plaintiffs recognize that SCS's payment of overtime is fatal to their claim, they weakly allege, *without any factual support*, that "the vast majority of overtime hours worked by SCS field technicians and installers go uncompensated." Doc. 53, p. 6. If there are Plaintiffs who have worked overtime and not reported it, then any overtime liability for SCS is not due to a "common decision, policy, or plan" of SCS. Therefore, allegations of overtime due to Plaintiffs' own failure to report time worked does not warrant conditional certification.

Similarly, while some of the Plaintiffs who have opted-in to this action are treated as exempt due to their duties as Field Service Supervisors, Senior Field Engineers, and Parts Supervisors, Plaintiffs again fail to make any argument as to how exempt status for these

---

[14]    Without asking the Court to rule on the merits, SCS notes that the treatment of Field Technicians as "salaried/non-exempt" is specifically authorized by the regulations of the Department of Labor. See 29 CFR § 778.109 ("The Act does not require employers to compensate employees on an hourly rate basis; their earnings may be determined on a piece-rate, salary, commission, or other basis, but in such case the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom …"); see generally 29 CFR Part 778 (overtime compensation regulations). Plaintiffs make no argument as to how SCS's treatment of the Field Technicians is violative of the Act.

individuals violates that FLSA.  Certainly, the FLSA envisions that individuals with managerial duties will be exempt from the overtime requirements of the Act.  29 U.S.C. § 213(a)(1) (exemption for employees employed in a bona fide executive, administrative, or professional capacity); 29 CFR Part 541 (related DOL regulations).[15]  Plaintiffs make no argument – much less substantial allegations – as to how the classification of these employees as exempt violates the FLSA.  Likewise, while complaining that they were not compensated for "on call" time, Plaintiffs never make any argument – much less "substantial allegations" – that demonstrate that such time (in light of the overwhelming evidence that employees may effectively use it for their own personal pursuits) should be compensated and that SCS (as a matter of a common decision, policy, or plan) violated the FLSA.[16]

In sum, Plaintiffs fail to meet their burden under *Thiessen* to show that they were victims of a common decision, policy, or plan that violated the law, and therefore the motion for conditional collective action certification should be denied.

## II.    Judicial Economy Will Not Be Served by Provisionally Certifying This Case.

Additionally, arguments by the Plaintiffs concerning "judicial economy" are unavailing in this case.  Indeed, in light of the lack of any "common" tie that renders Plaintiffs similarly situated and the lack of any clearly articulated theory under which Plaintiffs claim SCS violated

---

[15]    Again, without asking the Court to reach the merits, SCS notes that the duties performed by the Field Service Supervisors, Senior Field Engineers, and Parts Supervisors squarely fit within the description of "management" duties under the DOL's regulations, including "activities such as interviewing, selecting, and training employees; setting and adjusting their … hours of work; directing the work of employees; appraising employees productivity and efficiency …; disciplining employees; … apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment, or tools to be used or merchandise to be bought, stocked or sold; controlling the flow and distribution of materials or merchandise and supplies …." 29 CFR § 541.102.  .

[16]    See 29 CFR § 785.17 ("An employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call.'  An employee who is not required to remain on the employer's premises but is merely required to leave word at his home or with company officials where he may be reached is not working while on call.").

the Act, conditional certification serves no function of economy, but rather wastes further resources of the Court and the parties.

The concept of judicial economy should not be considered in a vacuum. Otherwise, courts would always aggregate claims by provisionally certifying collective actions. In light of the two step, *ad hoc* approach to certifying collective actions authorized by the Tenth Circuit in *Thiessen*, it makes little sense to provisionally certify this action, only to revisit identical issues in a second phase of these proceedings. There is simply no reason to postpone the inevitable determination that the putative Plaintiffs are not "victims of any common decision, policy, or plan," but rather present (at best) only individual issues as to overtime not reported or exempt status that makes litigation of this matter in a single proceeding unmanageable.   Judicial economy is served by considering the facts discerned through discovery that has been conducted to date (presumably, the very purpose of conducting such "notice stage" discovery) and finding that collective action certification is inappropriate.

Further, Plaintiffs' suggestion of sub-classes[17] tacitly acknowledges the alleged scope of this putative collection is overbroad.  Indeed, the concept of sub-classes (i.e., various groups of Plaintiffs should be aggregated together for purposes of prosecuting their unique claims) contravenes the Plaintiffs' argument that they are "similarly situated" under 29 U.S.C. §216(b). In making their suggestion that sub-classes may be appropriate, the Plaintiffs rely on hypothetical statements made by various courts which simply reserved the right to consider sub-classes at later points in time. For example, in *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282

---

[17] The Plaintiffs suggest the Court can consider separate sub-classes for Field Technicians and Installers. Doc. 53, p. 10, fn. 2. This would be an improper procedural end-around. Installers were not named in the underlying Complaint and, to date, there has been no discovery regarding Installers. See Doc. 58, which is incorporated herein by reference.

F.Supp.2d 91, 96, fn. 1 (S.D.N.Y. 2003), the Court postulated that it "may later decertify the class, or divide the class into subgroups, if appropriate." Importantly, in *Gjurovich,* the Court noted *it had not determined the putative plaintiffs were similarly situated, id.,* a determination this Court must make under the Tenth Circuit's analysis outlined in *Thiessen.* 267 F.3d at 1102.[18] Given the Court's obligation under *Thiessen* to determine whether Plaintiffs are "similarly situated," this sort of "sub-class" analysis would be inappropriate.

Certification and subsequent judicial economies are not presumed, foregone conclusions.[19] The present case highlights the potential inefficiencies associated with provisionally certifying a case. In particular, the Court has before it the facts necessary to determine that the putative Plaintiffs are not similarly situated because they are not all considered to be non-exempt from the FLSA's overtime requirements, and thus are treated differently in the manner in which they are paid and record their hours worked. The Court also has before it no "substantial allegations" of any aspect of SCS's policies that Plaintiffs have even argued violate the law. If the Court provisionally certifies this case as a collective action, the parties will be forced to re-litigate an issue that is currently before the Court and ripe for determination.

---

[18] Likewise, the Court in *Vaszlavik v. Storage Technology Corporation*, 175 F.R.D. 672, 681 (D.Colo. 1997) speculated that it *may* create sub-classes associated with the plaintiffs' age discrimination claims under the Age Discrimination in Employment Act, 29 U.S.C. §621 *et seq.* after the *liability trial* in a procedurally unique *bifurcated proceeding applicable to discrimination claims* under *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977). Similarly, Plaintiffs' reliance on *Gieseke v. First Horizon Home Loan Corp.*, 408 F.Supp.2d 1164 (D.Kan. 2006) is misplaced. In *Gieseke*, Judge Murguia simply cited *Gjuurovich* for the proposition concerns about manageability (which has not been raised at this stage of these proceedings) should be addressed at the second stage of proceedings under the *ad hoc* approach. 408 F.Supp.2d at 1168. The Court did not, as the Plaintiffs suggest, note "the possibility of dividing the certified class into subgroups."

[19] The Court should also be mindful that conditional certification, if granted when unwarranted, gives plaintiffs an improper degree of leverage in the action. *In re: Delta Air Lines*, 310 F.3d 953, 957 (6th Cir. 2002)(recognizing that "certification of a plaintiff class places undue pressure on the defendant to settle. In such a case, '[m]any corporate executives are unwilling to bet the their company that they are right in big stakes litigation, and a grant of class status can propel the stakes of a case into the stratosphere.'"), *citing and quoting Blair v. Equifax Check Services*, 181 F.3d 832, 834 (7th Cir. 1999).

## CONCLUSION

For all of the foregoing reasons, SCS respectfully requests this Court's Order denying Plaintiffs' Motion for Conditional Collective Action Certification Pursuant to 29 U.S.C. §216(b), and for such other relief as the Court deems just and equitable.

Respectfully submitted,

/s/ Anthony B. Byergo

| | |
|---|---|
| Anthony B. Byergo | #77935 |
| Patrick F. Hulla | #16230 |
| Andrea C. Bernica | #21441 |

OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
Park Central Plaza
4717 Grand Avenue, Suite 300
Kansas City, MO  64112
(816) 471-1301
(816) 471-1303  *(Facsimile)*

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 19th day of March, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Mark V. Dugan
Steve Siegel Hanson Woody LLP
330 West 47th Street, Suite 250
Kansas City, Missouri 64112
816-714-7100
816-714-7101 (facsimile)
dugan@sshwlaw.com

**ATTORNEYS FOR PLAINTIFF**

/s/Anthony B. Byergo
**ATTORNEY FOR DEFENDANT**